Case 6:10-cv-00052-C-BG Document 22 Filed 01/09/12 Page 1 of 17 PageID 610

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2012 JAN -9 PM 3: 02

DEPUTY CLERK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| MARIA S. MONTEMAYOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 6:10-CV-00052-BG |
| ) | ECF |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. § 405(g), Plaintiff Maria S. Montemayor seeks judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Montemayor was provided an opportunity to consent to the jurisdiction of a United States Magistrate Judge, but she did not do so. Pursuant to the order of assignment, the undersigned now files this Report and Recommendation.

On February 26, 2008, Montemayor applied for benefits. She alleged a disability onset date of February 1, 2004. Her application was denied initially and on reconsideration. An Administrative Law Judge (ALJ) held a hearing and issued an opinion on September 23, 2009, finding that Montemayor was not disabled because she was able to return to her past relevant work. The Appeals Council denied review on January 25, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d

1

332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

## Factual Background

Montemayor previously worked as a medical receptionist. (Tr. 31, 130, 133.) She suffered an on-the-job injury in February 2004 when she was walking between buildings and tripped over a speed bump, causing immediate pain in her neck. (Tr. 218.) On October 7, 2004, a cervical spine MRI showed a broad-based disc bulge and a disc protrusion at C3-4, a disc bulge at C4-5, and a broad-based disc/osteophyte formation at C5-6. (Tr. 208–09.) Kamran Aflatoon, D.O. diagnosed her with degenerative disc disease at C4-5, C5-6, and C6-7 with foraminal stenosis, significant shoulder pain, and decreased range of motion on October 15, 2004. (Tr. 224.)

In December 2004, Montemayor underwent an anterior cervical fusion and discectomy performed by Richard Mulvania, M.D. (Tr. 191–93.) Just before surgery, Montemayor displayed decreased range of motion in her cervical areas: her flexion was 20 degrees; extension was 15 degrees; rotation was 25 degrees to the right and 20 degrees to the left; and lateral bending was 10 degrees on the right and 5 degrees on the left. (Tr. 196.) She exhibited weakness in abduction of her left shoulder and in the grip of her left hand. *Id.* Additionally, she had general hypesthesia in her left hand and specific hypesthesia in her left index finger. *Id.* On December 13, 2004, Montemayor reported doing "fairly well" after her surgery. (Tr. 290.) She was to wear a brace and limit neck movement and heavy lifting. (Tr. 291.) On February 14, 2005, Montemayor reported feeling fairly comfortable, though she was still experiencing stiffness with pain in her neck and left shoulder. (Tr. 285.)

Dr. Mulvania and Physician Assistant Michael Bumanglag examined Montemayor on

March 25, 2005. (Tr. 280.) She said that her upper extremity pain was "significantly improved following surgery as [was] her sensory deficit." *Id.* She reported experiencing soreness, spasms, and occasional headaches and said she suffered pain to rotating her neck, which significantly limited her flexion and extension. *Id.* Her cervical range of motion was left rotation to 10 degrees, right rotation to 20 degrees, forward flexion to 10 degrees, extension to 10 degrees, and lateral flexion to 5 degrees bilaterally. (Tr. 281.) She was to begin gentle range of motion exercises, and physical therapy was scheduled to begin in two weeks. *Id.*

On June 8, 2005, six months after her surgery, Dr. Mulvania saw Montemayor and noted cervical flexion to 25 degrees, extension to 30 degrees, right rotation to 40 degrees, left rotation to 30 degrees, and lateral side bending to 15 degrees bilaterally. (Tr. 273–74.) She exhibited generalized weakness but no localized weakness. (Tr. 274.) Approximately one month later, Montemayor returned with mild tenderness in the mid to lower cervical area and mild to moderate spasms. (Tr. 267.) Montemayor wanted to return to work and described her job to Dr. Mulvania, who determined that it was relatively light work and suggested that she return to work on a trial basis. (Tr. 268.)

Dr. Mulvania examined Montemayor again on August 24, 2005. (Tr. 261–64.) She complained of left shoulder and trapezius pain, particularly when she raised her arm to shoulder height, in addition to muscle spasms and tenderness. (Tr. 261.) She believed her cervical spine range of motion was improving. (Tr. 262.) Dr. Mulvania noted that her cervical spine flexion was to 30 degrees, extension was to 30 degrees, right rotation was to 60 degrees, left rotation was to 50 degrees, right lateral flexion was to 10 degrees, and left lateral flexion was to 15 degrees. *Id.* No localized weakness was noted other than left shoulder abduction. *Id.* She exhibited mild diminished

sensation in the two ulnar digits of her left hand, but no associated motor weakness was noted. *Id.* Dr. Mulvania recommended continued physical therapy and pain medication. (Tr. 262–63.)

Dr. Mulvania saw Montemayor again on September 26, 2005, and reported that she had undergone a left knee arthroscopy one week prior and had been on crutches, which seemed to aggravate her neck and shoulder discomfort and spasms. (Tr. 255.) She reported discomfort in her left shoulder and upper arm with overhead reaching. (Tr. 256.) She denied radicular pain and had no gross motor weakness in the upper extremities. *Id.* Dr. Mulvania recommended that she continue physical therapy, perform stretching exercises, use moist heat, and take pain medication. *Id.*

Albert Simpkins, Jr., M.D., the agreed medical evaluator for Montemayor's workers' compensation injury, evaluated Montemayor on September 27, 2005. (Tr. 357.) Montemayor had no complaints about her left arm at the time of her evaluation but reported radiating pain in her neck and left knee pain. (Tr. 360.) Dr. Simpkins recommended that Montemayor be given the option of injections in her left shoulder and, if needed, an MRI. (Tr. 364.)

On October 31, 2005, Montemayor was seen again by Dr. Mulvania. (Tr. 250–53.) She stated that she had some neck pain but no radiating pain other than in her left shoulder. (Tr. 251.) Dr. Mulvania recommended a steroid injection to help relieve the pain, but Montemayor was reluctant and instead was given Celebrex and advised to do independent exercises. (Tr. 252.)

At an appointment with Dr. Mulvania on January 25, 2006, Montemayor complained of continued pain in her cervical spine area radiating down her left arm to her fingers. (Tr. 237.) She also reported that her left arm was weak and had generalized numbness. *Id.* Dr. Mulvania noted that an MRI showed a mild posterior protrusion at the C6-7 level with encroachment into the left neural foramina. (Tr. 238.) Dr. Mulvania recommended a cervical discogram at C6-7 and possibly a

cervical fusion at C6-7. (Tr. 239.)

Dr. Simpkins evaluated Montemayor on April 17, 2006, and recommended that she undergo a transforaminal block at C6-7 to evaluate for improvement before considering an additional cervical surgery. (Tr. 340, 346.) He noted that her left shoulder had "abysmal range of motion" but expected improvement with further rehabilitation treatment. (Tr. 346.) He stated that additional physical therapy would help her left knee, which was causing an antalgic gait. *Id.*

Dr. Simpkins again examined Montemayor on September 17, 2007. (Tr. 323.) She reported radiating pain in her neck, left shoulder, and left knee and difficulty performing household chores and preparing meals at times. (Tr. 324–25.) She also reported difficulty lifting, carrying, bending, twisting, pushing, pulling, kneeling, squatting, crawling, climbing stairs, standing and walking for long periods, and difficulty sleeping at times. (Tr. 325.) She exhibited decreased range of motion in her neck, left shoulder, and left knee. (Tr. 325–39.) Dr. Simpkins stated that Montemayor had reached maximum medical improvement and did not require additional surgical intervention. (Tr. 329.) He recommended that Montemayor be precluded from heavy work activities, including repetitive neck movement and prolonged upward or downward gazing. (Tr. 333.) He also advised that she should avoid heavy lifting, pushing, pulling, and activities involving repetitive work at or above shoulder level. *Id.* With regard to her knee, Dr. Simpkins recommended that Montemayor avoid prolonged walking or standing, repetitive kneeling, squatting, crawling, or climbing. *Id.* Based on Montemayor's statements that her prior job involved repetitive movement and downward gazing, Dr. Simpkins did not believe that she would be able to return to her job. *Id.*

Physician Assistant Anthony Anderson saw Montemayor on February 6, 2008. (Tr. 390.) She complained of mild left shoulder pain, left knee pain, and neck pain radiating from her shoulder

5

down to her left hand. *Id.* According to Anderson, Montemayor received a cortisone injection that helped but had worn off. *Id.* He found that her left shoulder and left knee exhibited full range of motion. *Id.* Anderson stated that Montemayor might have cervical disease at C6-7 and should return to her neck surgeon for consultation. *Id.* He also recommended that she continue therapy and home exercises. *Id.* He recommended that she attempt a full recovery and not "jump right into going for disability[.]" *Id.*

On May 15, 2008, consulting physician John Sedgh, M.D. examined Montemayor and noted that her cervical spine had decreased range of motion with no evidence of spasms or tenderness. (Tr. 394.) Her strength was 5/5 in her right upper and lower extremities and 4/5 in her left upper and lower extremities. (Tr. 395.) Dr. Sedgh stated that Montemayor could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; and kneel, crouch, and stoop occasionally. (Tr. 396.) Radiographs showed that the left knee was within normal limits and that the lumbar spine had mild degenerative disc disease. (Tr. 398–99.)

On May 27, 2008, Joanne Zheutlin, M.D. reviewed Montemayor's medical records and opined that Montemayor could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for six hours out of an eight-hour day; sit for six hours out of an eight-hour day; push or pull an unlimited amount; occasionally climb, balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds. (Tr. 401–05.) She also found that Montemayor should avoid moderate exposure to vibration and all exposure to hazards such as machinery and heights. (Tr. 404.)

Consulting physician Jobst Singer, M.D. examined Montemayor regarding her complaint of depression on August 13, 2008. (Tr. 410.) He noted that she shopped, cooked, cleaned, did laundry

with assistance, dressed, bathed, and managed her money without assistance. (Tr. 411.) Montemayor also reported watching television, going to church, and walking. *Id.* She stated that her mood was "up and down but better since I started taking [E]ffexor." (Tr. 412.) Dr. Singer diagnosed Montemayor with depression not otherwise specified. *Id.* He indicated that Montemayor's ability to understand, remember, and follow instruction for simple tasks was unimpaired and her ability for complex tasks was only mildly impaired. *Id.* He identified no psychiatric factors that would significantly interfere with Montemayor's ability to complete a normal day of work, other than her reported medical problems and associated effects. *Id.* Montemayor showed no significant judgment impairment that would create a risk in a normal work setting. (Tr. 413.) Her ability to relate and interact with coworkers and the public and her ability to be supervised were somewhat impaired. *Id.* He stated that her prognosis was improved with appropriate treatment and part-time work as her inactivity seemed to affect her mood adversely. *Id.*

On November 25, 2008, Charles McDonald, Ph.D. reviewed Montemayor's medical records and found that she was mildly limited in her activities of daily living and social functioning and moderately limited in her ability to maintain concentration, persistence, or pace. (Tr. 425, 435.) He also found that she had no periods of decompensation for an extended time. *Id.* He found that her alleged limitations were not fully supported. (Tr. 437.) He specifically noted that while Montemayor had some symptoms of depression, "her overall ability to sustain daily activities such as shopping, social interactions, household chores, and completing tasks are not wholly impaired. Her ability to sustain some level of employment is not totally compromised." *Id.* Dr. McDonald further indicated that Montemayor was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for

extended periods; complete a normal work week without the interruption of psychologically based symptoms; perform at a consistent pace without unreasonable rest periods; and respond appropriately to changes in the work setting. (Tr. 447–48.) He stated that Montemayor retained the "ability to understand, remember, and carry out detailed but not complex instructions, make basic decisions, concentrate for extended periods, and interact [with] others." (Tr. 449.)

On November 25, 2008, Frederick Cremona, M.D. reviewed Montemayor's medical records and opined that she could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for between four and six hours in an eight-hour day; sit for six hours in an eight-hour day; push or pull an unlimited amount; balance and crouch frequently; climb ramps and stairs occasionally, but never ladders, ropes, or scaffolds; and occasionally kneel, stoop, and crawl. (Tr. 439–46.)

A consulting physician reviewed an MRI of Montemayor's lumbar spine taken on May 4, 2009, and reported mild degenerative changes and a mild collapse of the superior end plate of L1. (Tr. 454.) On September 4, 2009, another consulting physician reviewed an MRI of the same area and reported a 5 to 10 percent compression fracture deformity of the superior vertebral body end plate of L1. (Tr. 182–83.) In addition, the physician reported mild and "mild to moderate" bulges and encroachment at several locations. *Id.*

## Standard of Review

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis

to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. § 404.1520(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's residual functional capacity (RFC). *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

Judicial review of a decision by the Commissioner is limited to two inquiries: "whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Discussion

I. <u>The opinion of Dr. Simpkins</u>

Montemayor asserts that the ALJ erred by failing to mention or analyze the opinion of Dr. Simpkins, who stated that Montemayor was "incapable of performing her prior job as a medical receptionist due to her continuing neck problems[.]" (Pl.'s Br. 10–13.)

Opinions on certain issues are not considered medical opinions because they are administrative findings that are dispositive to a case and therefore reserved for the Commissioner. 20 C.F.R. § 404.1527(e). Opinions on issues reserved for the Commissioner are "never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). A statement by a medical source that a claimant is "disabled" or "unable to work" is not given any special significance. See 20 C.F.R. §§ 404.1527(e)(1), 404.1527(e)(3). To give controlling weight to such an opinion would allow a medical personnel, rather than the Commissioner, to decide whether a person is disabled. SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).

Dr. Simpkins stated that based on Montemayor's description of her prior job, "she would be considered unable to return to these job duties." (Tr. 333.) Dr. Simpkins was examining Montemayor for workers' compensation claim purposes. His statement is an opinion on an issue reserved for the Commissioner's determination and therefore is not accorded special significance. See 20 C.F.R. §404.1527(e).

The crux of Montemayor's argument is that the ALJ did not mention the opinion of Dr. Simpkins. Montemayor cites to 20 C.F.R. § 404.1527(d) in support of her argument. (Pl.'s Br. 10.) The Court of Appeals for the Fifth Circuit has held that the requirements of that subsection do not apply to opinions on issues reserved to Commissioner. See *Frank v. Barnhart*, 326 F.3d 618, 620

10

(5th Cir. 2003). Accordingly, Montemayor's argument does not require remand.

II.     Montemayor's limitations regarding complex instructions and decisions

Montemayor also argues that the ALJ's finding that she was unable to perform complex work precludes her from performing her past relevant work as a medical receptionist. (Pl.'s Br. 13–14.) In his RFC assessment, the ALJ stated that Montemayor was able to "understand, remember, and carry out detailed (but not complex) instructions[] [and] make judgments on detailed (but not complex) work-related decisions[.]" (Tr. 18.) According to the Dictionary of Occupational Titles (DOT), a job as a medical receptionist requires level three reasoning, defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and] [d]eal with problems involving several concrete variables in or from standardized situations." Dictionary of Occupational Titles app. C at 1011 (4th ed. 1991); id. at 174 (Listing 205.362-018).

Montemayor does not argue and the records in this case do not indicate that she is unable to perform the mental requirements of a medical receptionist such as obtaining a patient's name, address, age, and insurance and other personal information and typing it into a computer. See id. at 174 (Listing 205.362-018). Rather, she relies on Fletcher v. Astrue, No. 5:09-CV-070-BG, 2010 WL 1644877 (N.D. Tex. Mar. 31, 2010), to argue that inability to perform complex work precludes any positions that require level three reasoning.

In Fletcher, a consulting physician found that a claimant was "markedly limited in his ability to understand, remember, and carry out detailed instructions." Id. at *2. In his RFC assessment, the ALJ in that case limited the claimant to "non-complex jobs that require no interaction with the general public and only superficial interaction with supervisors and coworkers." Id. at *1. The court

held that the limitation of "non-complex work" was consistent with the consulting physician's finding regarding detailed instructions and would prevent the claimant from performing the job of janitor, which required level three reasoning according to the DOT. *Id.* at *2–4.

*Fletcher* does not require remand because the claimant in *Fletcher* was found to be markedly limited in following detailed instructions, whereas the ALJ in this case found that Montemayor was capable of doing so. *Id.* at *2. This distinction is important because the finding that the claimant in *Fletcher* could perform "work that would involve one-part tasks rather than detailed tasks" was central to the court's holding. *Id.* Furthermore, the court in *Fletcher* reasoned that commonsense understanding of the terms "detailed" and "complex" indicated that the ALJ used those terms synonymously in the context of that case. *Id.* In the instant case, the ALJ did not use "complex" and "detailed" as synonyms in his assessment of Montemayor's RFC.

A more recent case from the Northern District of Texas is instructive on the issue of whether Montemayor's RFC precludes all jobs that require level three reasoning. In *Morgan v. Comm'r of Soc. Sec.*, No. 3:10-CV-01061-BF, 2011 WL 4528423 (N.D. Tex. Sept. 30, 2011), the ALJ restricted the claimant to "detailed, but not complex work." *Id.* at *7. The court held that this RFC did not preclude the claimant from performing her past relevant work as a ticket seller, which required level three reasoning, because "nothing in the definition [of level three] states that it requires complex work." *Id.* Similar to the RFC in *Morgan*, Montemayor's RFC limits her to detailed but not complex instructions and decisions. Therefore, as in *Morgan*, Montemayor's alleged inability to perform complex work does not prevent her from performing at least some level three jobs, including her past relevant work as a medical receptionist.

III. The ALJ's restriction on overhead reaching

Montemayor argues, without citing authority, that the ALJ's preclusion of overhead reaching prevents her from performing her past relevant work as a medical receptionist. (Pl.'s Br. 15.) Additionally, she claims that the ALJ limited Montemayor to lifting to no more than twenty pounds, but her past job required her to lift twenty-five pounds. *Id.*

Initially, the court notes that the claimant bears the burden of proof at this step. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The ALJ's determination of whether a claimant can perform past work may be based on descriptions of "past work as actually performed or as generally performed in the national economy." *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The "mere inability of a claimant to perform certain 'requirements of his past job does not mean that he is unable to perform "past relevant work" as that phrase is used in the regulations[.]'" *Leggett*, 67 F.3d at 564 (quoting *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987)).

In this case, a vocational expert testified that an individual with Montemayor's limitations could perform her past work as a receptionist "as customarily performed." (Tr. 46.) The ALJ properly relied on this testimony to conclude that Montemayor could perform her past relevant work as a receptionist as that job is generally performed in the national economy. *See Leggett*, 67 F.3d at 565 (holding that vocational expert's testimony provided a basis for ALJ's finding that claimant could perform past job of cashier as it existed in the national economy). Accordingly, Montemayor's argument does not require remand.

IV. The ALJ's mental RFC assessment

Montemayor asserts that the ALJ's RFC finding did not adequately account for symptoms of her depression and affective mood disorder, including limitations for concentration, persistence,

13

pace, social functioning, and interacting with others. (Pl.'s Br. 16–18.) Montemayor also argues that the ALJ's mental RFC assessment is inconsistent with his step 2 finding that she had severe mental impairments and step 3 finding that she had moderate limitations in concentration, persistence, and pace and mild limitations in social functioning. *Id.* The ALJ held that Montemayor had the mental RFC to sustain work mentally; understand, remember, and carry out detailed but not complex instructions; make judgments on detailed but not complex work-related decisions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to usual work pressures and changes in the work setting. (Tr. 18.)

The following substantial evidence supports the ALJ's determination that Montemayor's RFC did not require additional mental limitations: Dr. McDonald found that Montemayor's ability to sustain employment was not totally compromised because "her overall ability to sustain daily activities such as shopping, social interactions, household chores, and completing tasks [were] not wholly impaired." (Tr. 437.) He also found that she retained the "ability to understand, remember, and carry out detailed but not complex instructions, make basic decisions, concentrate for extended periods, and interact [with] others." (Tr. 449.) Dr. Singer stated that Montemayor was unimpaired in her ability to understand, remember, and carry out simple tasks and only mildly impaired for complex tasks. (Tr. 412.) Regarding persistence, he opined that Montemayor had "no psychiatric factors that would significantly interfere with [her] ability to complete a normal day of work, other than the reported medical problems and associated effects[.]" *Id.* Dr. Singer also noted that she had experienced improvement from antidepressant medication, and he thought that work would improve her prognosis. (Tr. 412–13.) In addition, Montemayor reported getting along with her family, neighbors, friends, and authority figures and attending church. (Tr. 154–55, 411.)

In view of the foregoing substantial evidence, any alleged inconsistency in the ALJ's findings does not require remand because it did not affect Montemayor's substantial rights. *Slaughter v. Sec'y of Health & Human Res.*, 22 F.3d 1093 (5th Cir. 1994) (upholding ALJ's decision despite internal inconsistencies because the "inconsistency complained of did not affect [the claimant's] substantial rights") (per curiam) (not selected for publication).

V.       The ALJ's credibility finding

Montemayor contends that the ALJ's credibility finding regarding her subjective complaints of pain was inappropriately based on his belief that Montemayor's movements at the hearing were inconsistent with her allegations. (Pl.'s Br. 19–20.) Additionally, Montemayor asserts that a September 4, 2009, MRI constituted objective evidence to support her allegations of pain. *Id.* The MRI was not before the ALJ on the date he rendered his decision. *Id.* The ALJ found that Montemayor's capabilities were "compromised [by her symptoms] but not to the degree alleged[.]" (Tr. 23.)

An ALJ must make affirmative findings about a claimant's subjective complaints. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). While not before the ALJ, the September 2009 MRI was before the Appeals Council, which considered this evidence and denied Montemayor's request for review. (Tr. 3–7, 178–85.) As noted by both Montemayor and the Commissioner, the September 2009 MRI must be considered in this court's substantial evidence review. *See Higginbotham*, 405 F.3d at 337–38.

While the physician reviewing Montemayor's September 2009 MRI characterized some of her spinal issues as mild to moderate, the physician reviewing her May 2009 MRI characterized her problems as mild. (Tr. 182–83, 454.) Medical records indicate that Montemayor's pain and range

15

of motion improved after surgery. (*See* Tr. 251, 255, 262, 268, 273, 280, 290.) Dr. Sedgh and Dr. Zheutlin found that Montemayor could perform the physical requirements of light work. (Tr. 396, 402.) In addition, Montemayor engaged in activities of daily living, including meal preparation, housework, helping her child prepare for school, watching television, driving, attending church, paying bills, shopping, walking, and visiting her grandchildren. (Tr. 149–56, 411.) Considering all the evidence before the court, substantial evidence supports the ALJ's determination that Montemayor's allegations of pain were not wholly credible.

"While exclusive reliance upon demeanor in credibility determinations is inappropriate, it is not reversible error for an ALJ to consider demeanor as one of several factors in evaluating a claimant's credibility[.]" *Villa*, 895 F.2d at 1024 (internal citations omitted). In the present case, Montemayor's ability to move easily during the hearing was one of many factors the ALJ considered. (Tr. 22–23.) He listed a multitude of factors that he considered in making his credibility determination and specifically discussed her activities of daily living, the success of her surgeries, her compliance with her treatment plan, and her testimony. *Id.* Accordingly, the ALJ did not err in considering Montemayor's demeanor at the hearing.

## Conclusion

For the foregoing reasons, this court recommends that the United States District Court **AFFIRM** the decision of the Commissioner and **DISMISS** Montemayor's complaint.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or

recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: January 9, 2012

NANCY M. KOENIG
United States Magistrate Judge